2023 UT App 83

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEPHANIE ANN TUINMAN,
Appellant.

Opinion
No. 20210242-CA
Filed August 3, 2023

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 181800122

K. Andrew Fitzgerald, Attorney for Appellant

Sean D. Reyes and John J. Nielsen,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      A jury convicted Stephanie Ann Tuinman of murder, aggravated assault, and aggravated burglary. Stephanie[1] appeals her convictions, asserting that her right to a speedy trial was violated, that the trial court made certain erroneous evidentiary rulings, and that her trial attorney rendered constitutionally ineffective assistance. We reject all of Stephanie's arguments and affirm her convictions.

---

1. Because of the numerous Tuinman family members involved, we refer to many of those individuals by their first names, with no disrespect intended by the apparent informality.

BACKGROUND[2]

*The Attack*

¶2    On the evening of April 6, 2018, Stephanie was at her mother's (Mother) house with several family members, including her brother Thomas and his wife Samantha. Just days earlier, Thomas and Samantha had contacted police to report that their eight-year-old son (D.T.) had told them that he had been sexually abused by a family acquaintance (Roy). Thomas and Samantha had known Roy and his longtime life partner (Sandra)[3] for over a decade. The two couples were once close enough that Roy and Sandra would sometimes babysit Thomas and Samantha's children. Samantha testified at trial that she believed Sandra was "just as involved" in the abuse as Roy and had been "in the room" when it occurred. That April evening, D.T. asked if Roy had been arrested yet and when he was told that Roy had not been arrested, D.T. stated, "They didn't believe me, did they?" Thomas, who had been drinking heavily that night, asked D.T., "Do you want dad to go beat him up?" D.T. answered, "Yes."

¶3    Intent on taking "justice into [their] own hands," Thomas and Samantha got into their minivan, perhaps with certain other family members, and headed for Roy and Sandra's place, leaving Mother's house just after 9:00 p.m. Stephanie denies accompanying Thomas and Samantha to Roy and Sandra's place that night, and claims that she wasn't involved at all in what

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Carrera*, 2022 UT App 100, n.3, 517 P.3d 440 (quotation simplified), *cert. denied*, 525 P.3d 1264 (Utah 2023).

3. Roy and Sandra are pseudonyms.

happened next. Indeed, the main issue that the jury had to decide was whether Stephanie was present during the events in question.

¶4    Samantha testified at trial that Stephanie *did* get into the minivan and join them. As Samantha described it, she and Thomas were joined in their endeavor by not only Stephanie but also Stephanie's fiancé Byron and Stephanie's sister Kristy, as well as by a cousin, Michael. She testified that she and Thomas traveled to Roy and Sandra's place in the minivan, with Stephanie and Byron in the back seat; that Kristy followed behind in her own "little silver SUV"; and that Michael met them at Roy and Sandra's place in a different vehicle.

¶5    Roy and Sandra were at their house that evening, sitting at the kitchen table after dinner when Sandra heard a noise, went to the front door, and yelled, "Tommy!" When he looked out the front door, Roy "could see Tommy and Sammy," and he told Sandra to run out the back door. Thomas hit the front door with both fists, breaking the windows in it and then stepping through. Roy testified at trial that "Mikey" was there too, as well as Byron and "one of the [Tuinman] sisters"; he stated that he couldn't tell which one because "[t]hey look alike." Roy ran outside, following Sandra, but "Tommy" got to him in the backyard and "just started putting the boots to" Roy, kicking and hitting him while he was on the ground and later hitting him with a piece of wood that Roy thought was a "2x4." Roy remembered being hit or struck not only by Thomas, but also by "Sammy," "Mikey," Byron, and "one of the [Tuinman] sisters."

¶6    Samantha testified that she "had intentions to beat [Sandra] up," and when she saw Sandra "going through the gate" in the yard, she began to chase her. In Samantha's telling, she met up with Stephanie during the chase, and the two of them "kind of cornered" Sandra near a fence. Samantha grabbed Sandra by the hair, "pulled [her] down to the ground," and then "punched her five or six times" and "kicked her once in her back." Samantha

testified that Byron, Kristy, and Michael also participated in the attack on Sandra; she saw Byron kick Sandra in the face, Michael kick Sandra in the head, and Kristy hit Sandra with a hammer.

¶7    With regard to Stephanie, Samantha testified that Stephanie had a baseball bat in her hand, and that Stephanie "brought the bat up over her head, and brought it down on top of [Sandra's] head." Samantha stated that she was standing only about four feet away from Stephanie at the time, and that Stephanie hit Sandra "very hard." After the blow with the bat, Sandra stopped screaming and Samantha heard her make "a moaning sound." Roy had been able to hear Sandra "screaming 'help'" during "the whole time when they were kicking" him. After the attack was over, Roy found Sandra, and she said, "They got me. They hit me with a baseball bat in the face."

¶8    The attackers soon left, and one of them threw the bloodied baseball bat out the minivan window as they drove away. Roy and Sandra were eventually discovered by a neighbor (Neighbor), who called 911 and reported that Sandra was "bleeding really bad" from "her nose and her mouth" and looked like she'd been "beat up pretty bad." Neighbor reported to the 911 dispatcher that Sandra was saying that "the Tuinmans did this to her."

¶9    Roy sustained bruises and cuts all over, as well as several broken ribs and severe damage to his knee. But Sandra was hurt even worse, and medical personnel eventually decided to "life flight[]" her to a hospital in Provo, Utah. Roy was taken to a local hospital, where he spent nearly two weeks recovering; the injuries to his knee required surgery. But Sandra never left the hospital; she died about two weeks later from what the medical examiner determined was "a stroke which resulted from blunt injuries to her head" that she sustained in the attack.

*The Investigation*

¶10 On the night of the attack, police officers arrived at the scene and began questioning witnesses and collecting evidence. One officer testified that Sandra was "distressed," "hysterical," and "[v]ery bloody." That same officer described Roy as "a bloody mess," and observed that his hair was "tangled in blood" and that he was "bleeding from his face pretty bad too." While still at the scene, both Roy and Sandra told officers that "the Tuinmans" had committed the assault. Officers also spoke with Roy and Sandra again after they arrived at the hospital. Roy did not specifically identify Stephanie as one of the Tuinmans who had been at the house on the night in question because, as he explained at trial, he could not tell the Tuinman sisters apart. But at the hospital, Sandra apparently made certain statements to the effect that Stephanie had been one of the Tuinman sisters who had participated in the attack; in particular, Sandra stated that the Tuinman sister who was dating Byron was among her attackers.

¶11 In addition to speaking with Roy and Sandra, officers also began looking for and questioning members of the Tuinman family that night. At first, officers believed that the only Tuinmans involved in the attack were Thomas, Samantha, Byron, and a different Tuinman sister (Amy), who officers mistakenly believed was the sister in a relationship with Byron. So when an officer who had been instructed to look for Amy encountered Stephanie in a traffic stop at about 1:00 a.m. later that night, he simply asked her some questions largely aimed at ascertaining Byron's whereabouts. In responding to those questions, Stephanie denied knowledge of or participation in the events at Roy and Sandra's house that night. She claimed to have left Mother's house that evening because she had been "bleeding really heavy" and had gone to her house to "change [her] tampon"; she claimed that, by the time she returned, her family members had come back and she did not know where they had gone. Stephanie also claimed that

Byron did not go with Samantha and Thomas that night. During this initial traffic stop encounter, the officer asked Stephanie for her cell phone; she had it with her at the time and provided it to him. But because the officer did not at that point consider Stephanie a suspect, he did not retain or search the phone, and returned it to her after the encounter was over.

¶12 At various points during that first night, officers also interviewed (among others) Samantha, Amy, and Byron. Samantha told officers that she would only "talk about [her own] involvement," a statement officers took to mean that others were involved as well. But Samantha would not state that anyone else—other than she and Thomas—was involved. In fact, when asked if anyone else had been there that night, she said no. Amy denied any involvement at all. But Byron told officers that he and Stephanie were in the minivan with Thomas and Samantha, that they were at Roy and Sandra's place on the night in question, and that Stephanie had brought a baseball bat.

¶13 After conducting some of the other interviews—most notably Byron's—officers came to view Stephanie (rather than Amy) as a potential suspect, and asked to speak with her again, and she willingly complied. Officers conducted a second interview with Stephanie at about 4:00 a.m. at a police station, some three hours after their previous encounter. Wearing the same gray sweatshirt and black sweatpants as earlier, Stephanie again denied any involvement in the attack on Roy and Sandra. Officers who interacted with Stephanie testified that they saw no blood on Stephanie's clothing or on the places where she sat.

¶14 Officers had a third pre-arrest encounter with Stephanie the next night, on April 8, in connection with another traffic stop. During this encounter, officers asked to see her cell phone that she had willingly let them look at less than 48 hours earlier, but Stephanie did not have it and claimed to have lost it.

*Pretrial Proceedings*

¶15　On April 9, the State charged Stephanie with attempted aggravated murder, aggravated assault, and aggravated burglary, each with a "gang" enhancement asserting that the crimes had been committed "in concert with two or more persons."[4] Later, after Sandra died, the State amended the first count to aggravated murder, a potentially capital offense. Six months after that, however, the State amended the count again, this time from aggravated murder to simple murder, rendering the case no longer a potential capital case. From that time forward until trial, Stephanie faced three charges: murder (a first-degree felony), aggravated assault (a second-degree felony), and aggravated burglary (a first-degree felony).

---

4. That same day, the State also filed charges against Thomas, Samantha, Byron, and Michael. About seven months later, the State filed charges against Kristy. All six of the cases have now been resolved, at least at the trial level. As discussed herein, Samantha pled guilty to a reduced charge of manslaughter in August 2019, but was not sentenced until June 2021. *See State v. Samantha Tuinman*, No. 181800121 (Eighth District Docket). Kristy's case went to trial in October 2020, and Kristy was convicted; her case is currently on appeal. *See State v. Whitchurch*, No. 20200938-CA. Shortly after Kristy's trial, Byron pled "guilty and mentally ill" to two counts. *See State v. Thompson*, No. 181800123 (Eighth District Docket). In early March 2021, Michael's case went to trial and he was acquitted. *See State v. Michael Tuinman*, No. 181800120 (Eighth District Docket). Just two weeks later, in late March 2021, this case went to trial, resulting in Stephanie's conviction. And in April 2021, after all other co-defendants had been tried or had reached a plea agreement, Thomas pled guilty to three counts. *See State v. Thomas Tuinman*, No. 181800119 (Eighth District Docket).

¶16 Nearly three years elapsed between the filing of the initial information and the trial. Certain delays were involved with the case being—for about six months—a potential capital case; qualified capital defense counsel had to be located and retained. And even after the case was no longer classified as potentially capital, the case still involved serious charges involving five (and eventually six) co-defendants, a situation that presented difficulties in terms of trial presentation[5] and scheduling and that, in addition, placed something of a strain on the judicial and law-enforcement resources of a relatively small county.

¶17 After some initial delays associated with getting counsel appointed for all the defendants and with addressing some discovery issues, in August 2018 the trial court scheduled a preliminary hearing to take place in November 2018. At this August hearing, Stephanie's attorneys (Trial Counsel) orally "invoke[d] the right to a speedy trial for the record."

¶18 But a few days before the preliminary hearing was to occur, it was postponed because the State amended the information (to eliminate the capital charge) and provided new discovery to Trial Counsel. The preliminary hearing occurred, as rescheduled, in January 2019, and the magistrate later—in May 2019, after the parties submitted briefing—issued a written ruling binding Stephanie over for trial on all charges.

¶19 The State's main witness at the preliminary hearing was Samantha. Immediately after the attack, Samantha had been unwilling to state that anyone other than she and Thomas was

---

5. *See generally Bruton v. United States*, 391 U.S. 123 (1968) (holding that, in a criminal trial with two or more defendants, a co-defendant's out-of-court statement implicating the defendant's guilt cannot be offered against the defendant because it violates the defendant's Sixth Amendment right to confront and cross-examine witnesses).

involved. But in November 2018, Samantha had agreed to discuss the involvement of others; at the preliminary hearing, she testified that the State had offered to allow her to plead guilty to a "lesser charge" in exchange for "giving testimony in this case." And later, at trial, she explained that she made the decision to tell "the rest of the story" after D.T.—who was apparently "carrying the weight of" the situation—tried to harm himself. In any event, she submitted a written statement that was admitted into evidence at the preliminary hearing in which she stated, among other things, that Stephanie had not only been present during the attack but that Stephanie had hit Sandra on the head with a baseball bat.

¶20    After bindover, the court held a scheduling conference to discuss setting a trial date. But the court did not set one at that hearing, because attorneys for some of the defendants indicated they would file motions to sever the various trials. Indeed, just days later, Trial Counsel filed such a motion on Stephanie's behalf, asking the court to "sever her case from those of her co-defendants" so that "a jury can make a decision based upon the actual evidence and not based upon the fact that there are a whole bunch of people charged in this case." At oral argument on the motion, the court noted that the motions to sever could cause a "big delay" in getting the case to trial, but Trial Counsel nevertheless thought Stephanie's motion to sever was "terribly important because [Stephanie's] defense is she wasn't there" and most of "the other defendants who were there are admitting it." At the end of the oral argument on the motion, the court reserved ruling "due to other motions in limine and additional evidence that was being developed by the State that could affect the motion to sever." And a few weeks later, Trial Counsel filed a motion to change venue. Thus, by these motions, Stephanie asked that her trial be held separately from the other co-defendants and that it take place in a different county.

¶21    Several months passed, during which the parties updated their briefing on the motions and resolved several discovery

issues. At a hearing held in December 2019, even before issuing a ruling on the motion to sever, the court set a trial date for at least one trial, stating that—no matter how the motion to sever was decided—it could "go ahead and hold the trial for the defendants that haven't asked for severed trials." The date the court selected for the first trial was August 2020. But because it hadn't yet been determined whether the trials would be severed, it was unclear whether Stephanie's trial would occur on that date.

¶22 In early March 2020, Trial Counsel filed fourteen separate motions in limine, chiefly regarding evidentiary issues. Most notably for purposes of this appeal, Stephanie asked the court to exclude certain statements Sandra made to others on the night of the attack, including statements indicating that Stephanie had been present. And she asked the court to exclude from her trial all statements made by the co-defendants, including Byron. In this latter motion, she cited Confrontation Clause concerns with regard to all co-defendant statements, and raised an additional ground for exclusion that applied only to statements made by Byron: that he was allegedly incompetent when he made the statements in question.

¶23 Shortly after these motions were filed, the worldwide COVID-19 pandemic entered the scene. On March 13, 2020, Utah's chief justice issued an administrative order postponing all "non-essential" court hearings.[6] And in June 2020, the chief justice issued another administrative order suspending jury trials in all counties in the "red phase," noting that courts—even more so than other branches of government—needed to be cautious because "courts are in the unique position of having the

---

6. *See* Administrative Order for Court Operations During Pandemic, Utah Supreme Court (Mar. 13, 2020), https://legacy.utcourts.gov/alerts/docs/20200311%20-%20Pandemic%20Administrative%20Order.pdf [https://perma.cc/3EGH-3V3Z].

authority to compel individuals to appear" in court.[7] Once a county moved to the "yellow phase" or the "green phase," jury trials could resume. At the time, Duchesne County was in the red phase.

¶24   In April 2020, after the State withdrew its objection to the various motions to sever, the trial court granted Stephanie's motion to sever, ordering that her trial be held "separately from all co-defendants." But the court denied the motion to change venue, ruling that the trials would take place in Duchesne County. The court then scheduled individual trial dates for the various defendants, scheduling Thomas's trial first, then Michael's, both in August 2020 during the dates previously set. The court then set Stephanie's trial for September 2020, followed by Kristy's and Byron's, each of which was to take place in October.

¶25   With regard to the evidentiary motions Stephanie had filed, the court ruled inadmissible all of the statements Sandra had made on the night of the attack, including her statement identifying Stephanie, and it ruled—presumably on Confrontation Clause grounds, although the ruling was non-specific—that "all out of court statements made by" Thomas, Byron, Kristy, Amy, and Michael "will not be admitted at trial." The court made no mention of Stephanie's argument that Byron's statements should be excluded due to his alleged incompetence.

¶26   Several months before trial, Trial Counsel filed a notice of alibi, indicating that Stephanie would be offering an alibi defense, and stating that two witnesses would provide alibi evidence: Amy

---

7. *See* Administrative Order for Court Operations During Pandemic, Utah Supreme Court (June 26, 2020), https://legacy.utcourts.gov/alerts/docs/20200626%20-%20Amend ed%20Pandemic%20Administrative%20Order.pdf [https://perma .cc/9KE8-9U7R].

and a medical expert. Notably, the notice of alibi did not list Mother as a potential alibi witness.

¶27    On July 29, 2020, about six weeks prior to the scheduled trial date, Trial Counsel filed a document captioned Speedy Trial Invocation, purporting to "invoke[]" Stephanie's "right to a speedy trial pursuant to" the U.S. and Utah Constitutions, and opposing "any further delays in proceeding to trial." Stephanie also filed an affidavit offering to waive her right to a jury trial and have her case tried to the bench.

¶28    Soon thereafter, in mid-August 2020, the court, "upon its own initiative," struck Stephanie's September 2020 trial date, noting that Duchesne County was "still operating under the Red Phase of the pandemic order" and that the court was therefore prevented, by the chief justice's administrative order, from conducting "any criminal jury trials." And the court refused to "approve a waiver of the jury in this case" in order to hold a bench trial by videoconference, citing rule 17(c) of the Utah Rules of Criminal Procedure, and later explaining that, in this case, it was "unwilling" to "make credibility determinations in a remote setting." *See* Utah R. Crim. P. 17(c) ("All felony cases shall be tried by jury unless the defendant waives a jury in open court with the approval of the court and the consent of the prosecution.").

¶29    At an ensuing scheduling conference in mid-September, the court stated that it had been authorized by "the judicial council to hold jury trials in Duchesne County now," and that it was planning to go ahead with Kristy's trial, as previously scheduled, in early October. The court even noted that Kristy's trial would "be the first trial in the State of Utah" following the pandemic hold, and that "everybody" in the Utah legal community would be "looking to us now to see how that works

out."[8] The court then offered Stephanie a November 2020 trial date, noting that Stephanie's criminal case would take priority over all civil cases on the court's docket, and stating that if the court "vacated" all the civil matters on its November docket as well as perhaps one of its criminal law and motion calendars, it could fit Stephanie's trial into its November 2020 calendar, to begin on November 4. Trial Counsel was unfortunately unavailable for those November dates; the court then scheduled Stephanie's trial to take place in mid-December 2020, to follow on the heels of Michael's.

¶30   After the court struck the September 2020 trial date, Trial Counsel filed a motion to dismiss the entire case, asserting that Stephanie's right to a speedy trial had been violated. In that motion, Stephanie did not argue that Utah's chief justice lacked the authority to issue an administrative order putting criminal jury trials on hold; indeed, she asserted that "the pandemic can only be tangentially blamed for the delays." Instead, Stephanie pointed to the "scheduling chaos" that had resulted from six co-defendants being tried in a small jurisdiction, and asserted that "she cannot be held to account for the time lapse." After full briefing, the court denied Stephanie's motion to dismiss in a written ruling, concluding that the four-factor balancing test mandated by *Barker v. Wingo*, 407 U.S. 514 (1972), did not point to a violation of Stephanie's constitutional right to a speedy trial. The court determined that the delays in getting the case to trial were "justified" and had been caused by "the complexity and

---

8. Kristy's trial went forward as scheduled in October 2020, and it was indeed the first jury trial to be conducted anywhere in Utah after the pandemic hold. *See* Jessica Miller, *Utah Held Its First Jury Trial Since the Pandemic Started*, Salt Lake Tribune (Oct. 24, 2020), https://www.sltrib.com/news/2020/10/24/utah-held-its-first-jury [https://perma.cc/F6TJ-PHMR].

seriousness of the charges, the amount of discovery requests and pre-trial motions, and, ultimately, the COVID-19 crisis."

¶31    On November 24, 2020, just three weeks before Stephanie's trial was set to start, the court again struck the trial date for COVID-related reasons. It noted that, since it set the trial date back in September, "the transmission of COVID-19 throughout the State increased dramatically," and that Duchesne County was back in the red phase. The court informed the parties that it had been working with "medical experts who had been advising the courts" to develop "pilot protocols" that would enable jury trials to go forward even "under condition red." But given the severity of the recent spike in COVID-19 transmission, those experts had "recommended that the courts not proceed with the pilot program" because they "could not be confident that the protocols could safeguard court participants." At a scheduling conference held in mid-December, the court rescheduled Stephanie's trial, this time scheduling it to begin on March 24, 2021.

¶32    In preparation for trial, Trial Counsel became aware that Samantha—shortly after being arrested in April 2018—had a conversation with an attorney (Attorney) who had, at the time, been representing Michael.[9] Attorney had gone to the jail to visit Michael, but jail personnel mistakenly brought Samantha— instead of Michael—to the interview room. Attorney explained to Samantha that he was not her lawyer, but Samantha expressed a desire to speak with him anyway, and she provided Attorney with a version of events that was roughly consistent with what she had told officers earlier: that she and Thomas were the only ones who had participated in the attack, and that no other family members were present. Attorney had offered this testimony at Kristy's trial in October 2020; he had been called at the behest of

───────────────

9. The facts in this paragraph come from Attorney's declaration that is not part of the record, but was submitted in connection with Stephanie's rule 23B motion. *See* Utah R. App. P. 23B(a).

Kristy's attorneys, who used his testimony in an effort to impeach Samantha's story—relayed at Kristy's trial—that Kristy had been present and participated in the attack.

¶33    In the months leading up to Stephanie's trial, some of the other family members' cases were resolved in various ways. Kristy was convicted at her October 2020 trial. Just days after that verdict, Byron pled "guilty and mentally ill" to certain charges. And in early March 2021, just two weeks prior to the scheduled start of Stephanie's trial, a jury acquitted Michael on all counts.

*The Trial*

¶34    Stephanie's jury trial began on March 24, 2021. In support of its case-in-chief, the State presented testimony from (among other witnesses) Samantha, Roy, various law enforcement officers, the medical examiner who performed the autopsy on Sandra, and Byron.

¶35    Samantha testified as she had at the preliminary hearing: that Stephanie had been present at the attack and had participated in it by, among other things, hitting Sandra over the head with a baseball bat. The State acknowledged that this account differed from what Samantha originally told officers and from what she had told Attorney at the jail; the State preemptively asked Samantha about these inconsistencies, and she explained how D.T.'s struggles motivated her to tell "the truth of what had happened." She acknowledged that, in return for her testimony against her co-defendants, the State offered her a plea of manslaughter. When asked about Stephanie's health, Samantha stated that her sister-in-law has "menstrual bleeding issues" and occasionally has to use oxygen, but Samantha testified that Stephanie did not seem to have had trouble with ordinary activities on April 6.

¶36    On cross-examination, Trial Counsel followed up with Samantha about her interaction with Attorney. Samantha confirmed that she spoke with Attorney before meeting with her own lawyers, and that Attorney "asked [Samantha] very specifically who was present on the night of the attack." Samantha testified that she did not specifically recall what her answer was, but she was "pretty sure [she] told him the same thing that [she] had told the officers." Trial Counsel also asked Samantha about her plea arrangement, and Samantha explained that D.T. was struggling a lot, that he "needs his mother," and that she was willing "to do whatever" it took to be with her son.

¶37    A detective (Detective) who had interviewed both Samantha and Stephanie on the night of the attack testified that when Samantha first spoke to him, she was hesitant and her statement that she would "only talk about [her] involvement" led him to believe that there were more people involved than just Samantha. He recounted for the jury that, when he interviewed Stephanie, she claimed she never went to Roy's house and was in the bathroom at Mother's house when her siblings left. Detective also testified that, at one point early in his interview with Stephanie, he told her he thought she was lying because of "the statements that" officers had already taken.

¶38    On cross-examination, Trial Counsel asked Detective about his statement to Stephanie, during the interview, that he thought she was lying, and suggested that Detective—by making that statement—was employing aggressive interview techniques. Detective replied that calling a suspect a liar during an interview "could be" a tactic, but he clarified that the "main goal is to try to get to the truth." Trial Counsel then asked Detective, "Then why would you call somebody a liar right out of the gate?" Detective replied, "Because I didn't think I was getting the truth."

¶39    After this exchange, the State asked for a sidebar before beginning its redirect examination of Detective. The trial court

then ruled—outside the presence of the jury—that Trial Counsel, by asking Detective about his reasons for calling Stephanie a liar, had "opened the door" to the previously excluded statements of Sandra and Byron to come in for their "effect on the hearer." The court explained that its earlier ruling excluding those statements had caused the State to "steer[] clear of finding out why [Detective] would want to investigate Stephanie," but Trial Counsel "went on to extensively question why he would call [Stephanie] a liar and made a lot of hay out of him calling her a liar and investigating her with no evidence or no reason to even question her." Detective was "bound by [the court's] prior ruling to not discuss any hearsay" so Trial Counsel's questioning "paint[ed] the picture that [Detective] was doing something improper." Thus, the court ruled that the previously excluded hearsay statements from Sandra and Byron became admissible to explain Detective's skepticism of Stephanie's account.

¶40    On redirect, Detective then explained to the jury why he thought Stephanie had been less than truthful during the interview. He testified that, at the time he interviewed Stephanie, he already knew about two pieces of evidence: (1) Sandra's statement at the hospital that the Tuinman sister who was dating Byron had been among her attackers, and (2) Byron's statement that Stephanie rode with him, Thomas, and Samantha to Roy's house the night of April 6. Detective explained that he called Stephanie a liar because her answers to his questions were inconsistent with Sandra's and Byron's statements.

¶41    The medical examiner testified that Sandra died from "a stroke that resulted from blunt injuries that she sustained during an assault." Two of the bruises on Sandra, he explained, were "pattern injuries that are consistent with having been inflicted by a particular type of object." He also stated that Sandra had bruises that looked like she had been hit with a "rod-like object."

¶42    Finally, the State called Byron to testify. In pretrial proceedings, Trial Counsel had tried to prevent Byron from testifying not only because he was a co-defendant, but also because he had been deemed incompetent for a brief period.[10] As noted above, Byron's statements were initially deemed inadmissible, presumably on Confrontation Clause grounds. But any Confrontation Clause concerns had been resolved by Byron's October 2020 plea, and Trial Counsel did not make or renew, at trial, any objection to Byron's testimony. Instead, Trial Counsel attempted to use Byron's supposed incompetency as a basis to call his credibility into question: he raised concerns with Byron's veracity in opening statement, on cross-examination, and in closing argument, arguing that Byron had a low IQ, that he was easily manipulated, that he heard voices, and that he had pled "guilty but mentally ill" to the lesser charge of manslaughter.

¶43    In his trial testimony, Byron initially denied that Stephanie went to Roy's house the night of the attack. The State impeached that testimony, however, with the prior inconsistent statement Byron had made in his police interview, which statement was admitted into evidence and played for the jury; in that statement, Byron said that "[m]e, Samantha, and Stephanie" were in the minivan with Thomas that night. After listening to his interview statement, Byron then testified that he had in fact told police that Stephanie was also in the van with them and that "she brought the bat" with her, but he maintained that he had been "intimidated" into saying that.

¶44    Stephanie called her sister Amy to testify as an alibi witness. Amy testified that on the evening of April 6, she helped clean up blood that was "everywhere" when Stephanie

_____

10. At a court hearing on March 4, 2019, Byron was determined to be incompetent to assist in his own defense. By June 3, 2019, however, he was deemed competent to stand trial and was ordered to proceed to trial in his case.

hemorrhaged, and that Stephanie went home to get cleaned up a couple of times, implying that Stephanie did not go to Roy and Sandra's house because Stephanie was only gone for about "10, 15 minutes." Amy could not remember, however, the precise time when Stephanie or her siblings came and went that evening.

¶45    During trial, Stephanie asked the court for permission to present Mother as an additional alibi witness. The State objected, noting that Mother was not listed on Stephanie's notice of alibi. Trial Counsel did not provide a reason why Mother was not listed on the notice. The court ruled that Mother could not offer evidence about a phone call Stephanie claimed to have made on her way to Mother's house or about the timing of when Stephanie came back to the house. Mother did eventually testify, though, about Stephanie's medical issues, claiming that Stephanie had bleeding problems "[e]very day, every month," and that she had been having such problems on April 6.

¶46    In closing, Trial Counsel urged the jury to consider how "Samantha, by her own admission, has lied multiple times throughout these proceedings and throughout this case." He reminded them that Samantha "told [Attorney] it was just her and Tommy" but, when offered a deal for a lesser sentence, "she began to implicate other people" and "began to tell the new narrative." In its rebuttal argument, the State acknowledged that Samantha had said different things at different times about who was present at the attack, and that "[t]here's disagreement on how credible [Samantha] is." The State urged the jury, however, to credit Samantha's later version of events, the one she told after "what happened with her son."

¶47    After deliberation, the jury found Stephanie guilty of murder, aggravated assault, and aggravated burglary, each with a gang enhancement. Immediately after the verdict, the State asked that sentencing happen quickly, stating that it was only going to "request concurrent sentencing with just the . . .

minimum mandatory as part of the sentence," and that, in its view, there was no need for a presentence report. The State further explained that there was to be a "change in the law . . . in May," just a few weeks hence, that (if applicable) would make Stephanie's mandatory minimum sentence shorter on the murder and burglary charges. The State therefore asked that Stephanie's sentencing take place before the new statute went into effect. Trial Counsel did not object to the State's request, at that time saying simply that he was "not aware of the change in the law" and therefore "not prepared" to address it.

¶48 Sentencing occurred on April 12, before the new statute took effect. Trial Counsel lodged no objection to the timing of the sentencing. At the conclusion of the sentencing hearing, the court sentenced Stephanie to concurrent prison terms, including a term of twenty years to life on the murder charge and a term of ten years to life on the aggravated burglary charge.

ISSUES AND STANDARDS OF REVIEW

¶49 Stephanie appeals, raising five issues for our consideration. First, she contends that the trial court violated her right to a speedy trial. "Whether a defendant's right to a speedy trial has been violated presents a question of law, which we review for correctness." *State v. Steele*, 2010 UT App 185, ¶ 14, 236 P.3d 161.

¶50 Second, Stephanie challenges the trial court's refusal to allow Mother to offer alibi testimony. A trial court's exclusion of "an alibi witness because the defense had failed to timely notify the prosecution" is reviewed for abuse of discretion. *See State v. Perea*, 2013 UT 68, ¶¶ 87–88, 322 P.3d 624.

¶51 Third, Stephanie challenges the trial court's ruling that Trial Counsel opened the door to admission of previously excluded statements. "Trial courts have broad discretion to admit

or exclude evidence, and we will disturb an evidentiary ruling only for an abuse of discretion." *State v. Samora*, 2021 UT App 29, ¶ 18, 484 P.3d 1206 (quotation simplified), *aff'd*, 529 P.3d 330 (Utah 2023). And relatedly, Stephanie asserts that, if Trial Counsel opened the door to admission of these statements, he rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

¶52 Fourth, Stephanie contends that the trial court erred in moving forward with sentencing before a statutory change took effect. If this challenge were preserved for appellate review, we would review the court's ruling for abuse of discretion. *See State v. Grover*, 2022 UT App 48, ¶ 31, 509 P.3d 223. But in this instance, Stephanie recognizes that her challenge is unpreserved for our review, and she asks us to apply the "exceptional circumstances" exception to our preservation rules.

¶53 And finally, in addition to the issues raised on direct appeal, Stephanie has also filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court in order to supplement the record with evidence to support a separate claim of ineffective assistance of counsel, namely, that Trial Counsel was ineffective for choosing not to call several witnesses at trial, including Attorney. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Florez*, 2020 UT App 76, ¶ 16, 465 P.3d 307 (quotation simplified).

ANALYSIS

¶54   We discuss Stephanie's five claims in turn. We first evaluate her assertion that the trial court violated her right to a speedy trial. We then analyze whether the court erred in preventing Mother from offering alibi testimony. Next, we discuss the issues Stephanie raises regarding the court's ruling that Trial Counsel "opened the door" to admission of previously excluded statements. We then examine Stephanie's complaint about the timing of her sentencing. And finally, we assess the merits of Stephanie's rule 23B motion. For the reasons discussed, we reject all of Stephanie's claims.

## I. Speedy Trial

¶55   "The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a speedy and public trial." *State v. Thompson-Jacobson*, 2022 UT App 29, ¶ 9, 508 P.3d 604 (quotation simplified). But this "right is amorphous, slippery, and necessarily relative as it must take into account the defendant's rights as well as the rights of public justice." *State v. Samora*, 2022 UT App 7, ¶ 18, 504 P.3d 195 (quotation simplified), *cert. denied*, 525 P.3d 1254 (Utah 2022).

¶56   When assessing speedy trial claims, courts follow the four-factor test set forth by the United States Supreme Court. *Id.* ¶ 19; *see also Barker v. Wingo*, 407 U.S. 514, 530 (1972). The four *Barker* factors are (1) "[t]he length of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) whether the delay resulted in "prejudice to the defendant." *Barker*, 407 U.S. at 530.

### A

¶57   The first factor—length of delay—constitutes a "double enquiry." *See Doggett v. United States*, 505 U.S. 647, 651 (1992). As

an initial matter, we must inquire whether "the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Id.* at 651–52 (quotation simplified). And here, that line has been crossed. The one-year milestone is generally considered to "mark[] the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Id.* at 652 n.1. Because the delay in this case is nearly three years, we must engage in the full four-factor assessment of whether Stephanie's speedy trial rights were violated.

¶58 In addition, where—as here—the delay exceeds the one-year threshold, we must engage in the second part of the first factor's "double enquiry" and "consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* at 652. Three years is certainly longer than the usual criminal case takes to reach trial. And to that extent, this factor weighs at least somewhat in Stephanie's favor. But the *reason* for the delay is much more important in a speedy trial analysis than a rote counting of the number of days of delay and, as we explain immediately below, much of the delay in this case can be attributed to Stephanie and not much of it can be attributed to the State. In light of these realities, we do not weigh this first factor very heavily in Stephanie's favor.

B

¶59 The second *Barker* factor—the reason for the delay—"is a crucial factor" that is especially important; it has been described as "the flag all litigants seek to capture." *State v. Hintze*, 2022 UT App 117, ¶ 29, 520 P.3d 1 (quotation simplified), *cert. granted*, 525 P.3d 1279 (Utah 2023). If a defendant is responsible for the delay, then the State cannot be said to have violated that defendant's right to a speedy trial. *See, e.g.*, *United States v. Koerber*, 10 F.4th 1083, 1109 (10th Cir. 2021) (refusing to find a speedy trial violation where the defendant "intentionally delayed his case in order to

try and obtain a dismissal with prejudice"). But even where the State is responsible for some delay, it matters whether the State delayed the case on purpose or not. *See Barker*, 407 U.S. at 531 (noting that "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," but that "more neutral reason[s] such as negligence or overcrowded courts should be weighted less heavily").

¶60    In this case, various delays can be attributed to (1) the pandemic, (2) the State, and (3) Stephanie, and our first task, in assessing this important second factor, is to ascertain how much of the 1,071-day time lapse is attributable to each of the three potential agents of delay. The State asserts that 641 days of delay are attributable to Stephanie, largely due to her motion to sever and associated litigation; 233 days to "either the prosecution or routine court delays"; and 197 days to the pandemic. Stephanie does not take issue with the State's calculations and, from our review of the record, the State's calculations appear to be sound.[11]

¶61    With regard to the 233 days of delay attributable to either the State or to "routine court delays," Stephanie makes no allegation that any of this delay was intentional on the part of the State; in fact, she does not even allege that any of this delay was due to any *negligence* by the State. We find persuasive the State's contention that all of this delay "resulted from the complications

___

11. If anything, the State's calculation regarding pandemic-related delays is conservative. Recall that the court offered the parties a November 2020 trial date, but that date was not acceptable to Trial Counsel, resulting in the December 2020 setting that was eventually canceled due to the pandemic. Assuming that the November-to-December delay should be laid at the feet of Stephanie rather than the pandemic, the pandemic-related delay would be more like 160 or 170 days and Stephanie's delay more like 660 or 670 days. But for purposes of our analysis, we accept the State's numbers as accurate.

of having a capital case" located in a small jurisdiction "with multiple co-defendants." As the State points out, Trial Counsel "either stipulated to that delay or did not oppose it." On this record, we detect absolutely no gamesmanship, tactical delay, or even negligence on the part of the State. While these 233 days of delay must, by definition, be weighed against the State, under these circumstances they weigh only lightly so.

¶62 With regard to pandemic-related delay, Stephanie asserts that all 197 of these days should be held against the State. But she can hardly blame Duchesne County prosecutors, or even the trial court, for the delays attributable to a global pandemic, or for following administrative orders handed down by Utah's chief justice or the judicial council. Instead, she attempts to blame the chief justice and the judicial council, arguing here—for the first time on appeal—that the Utah judiciary had no authority to issue administrative orders suspending jury trials during the COVID-19 pandemic. But this assertion is unpreserved; Stephanie did not argue, before the trial court, that the court could or should ignore the chief justice's administrative orders, or that the court was violating her constitutional rights by following them. Instead, she made different arguments at trial, in particular stating that "the pandemic can only be tangentially blamed for the delays." And because Stephanie does not ask us to apply any of the exceptions to our preservation doctrines in this respect, we do not further discuss her argument that the trial court may have violated her constitutional rights by hewing to orders handed down from the chief justice or the judicial council.[12]

---

12. Although we do not further discuss the issue, the State asserts that nearly all courts to have considered the matter "have rejected claims that the pandemic did not give courts authority to suspend or toll speedy trial rights." *See Lemons v. State*, No. 10-21-00136-CR, 2022 WL 1259198, at *4 (Tex. Ct. App. Apr. 27, 2022); *Belcher*

(continued…)

¶63    Indeed, it seems to us that delays associated with a once-in-a-century worldwide pandemic should not in fairness be held against the State in a Sixth Amendment speedy trial analysis. This view comports with that of nearly all courts to have considered the matter, *see, e.g.*, *United States v. Chu*, No. 19-cr-0678-WJM, 2022 WL 475615, at *4 (D.N.J. Feb. 16, 2022) (concluding that pandemic-related delays were attributable to "nobody at all" and therefore did not weigh in favor of finding a speedy trial violation), either under the Sixth Amendment[13] or under specific speedy trial

---

*v. State*, No. 82255, 2022 WL 1261300, at *4 (Nev. Apr. 27, 2022); *State v. Malachi*, No. 1912018583, 2021 WL 4805515, at *2–3 (Del. Super. Ct. Oct. 14, 2021); *State v. Rodriguez*, No. 1811005093, 2021 WL 1221461, at *2–3 (Del. Super. Ct. Mar. 30, 2021); *People v. Mayfield*, 2021 IL App (2d) 200603, ¶¶ 16–25, 186 N.E.3d 571.

13. *See Rodriguez*, 2021 WL 1221461, at *3–6 (explaining that COVID-related delay was not attributable to either party and thus was not weighed in favor of a speedy trial claim under the Sixth Amendment); *see also Labbe v. State*, 869 S.E.2d 520, 529–30, 530 n.5 (Ga. Ct. App. 2022); *People v. Weis*, No. 5-21-0076, 2022 IL App (5th) 210076-U, ¶ 84 (Mar. 7, 2022); *State v. Tesch*, No. 21-0343, 2022 WL 1100922, at *2–4 (Iowa Ct. App. Apr. 13, 2022); *Callender v. State*, No. 1070, Sept. Term, 2020, 2021 WL 5371209, at *15–17 (Md. Ct. Spec. App. Nov. 18, 2021); *State v. Jackson*, 968 N.W.2d 55, 61 (Minn. Ct. App. 2021); *Berryman v. State*, No. 2020-KA-00710-COA, 2021 WL 5192852, at *8 (Miss. Ct. App. Nov. 9, 2021); *State v. Brown*, 964 N.W.2d 682, 693 (Neb. 2021); *Belcher*, 2022 WL 1261300, at *5; *Lemons*, 2022 WL 1259198, at *4; *Commonwealth v. Murphy*, No. 0197-21-2, 2021 WL 3501732, at *5–6 (Va. Ct. App. Aug. 10, 2021); *People v. Williams*, No. SX-2019-CR-00034, 2022 WL 1211307, at *4 (V.I. Apr. 21, 2022); *Cotney v. State*, 503 P.3d 58, 66–67 (Wyo. 2022).

statutes.[14] We therefore conclude that the 197 days of pandemic-related delay should be considered justified, or at least considered "neutral" and weighed against neither side.[15]

¶64 Thus, in this case we have 641 days of delay attributable to Stephanie, 233 days of non-negligent delay attributable to the State, and 197 days of pandemic-related delay attributable to "nobody at all." *See id.* Under these circumstances, this factor does not weigh in favor of Stephanie, and does not weigh in favor of finding a Sixth Amendment violation.

---

14. *See United States v. Olsen*, 21 F.4th 1036, 1047 (9th Cir. 2022) (holding that COVID-related delay was justified under the Speedy Trial Act); *see also United States v. Perez*, No. 4:22-cr-00002-DN-PK, 2022 WL 1004216, at *4 (D. Utah Apr. 4, 2022); *Stanley v. Superior Court of Contra Costa County*, 50 Cal. App. 5th 164, 168–69 (2020); *People v. Lucy*, 467 P.3d 332, 337 (Colo. 2020); *Smith v. State*, 310 So. 3d 1101, 1102–04 (Fla. Dist. Ct. App. 2020); *State v. Prano*, 510 P.3d 690, 695 (Idaho Ct. App. 2021); *Blake v. State*, 176 N.E.3d 989, 994 (Ind. Ct. App. 2021); *Commonwealth v. Lougee*, 147 N.E.3d 464, 468 (Mass. 2020); *State v. Brown*, 964 N.W.2d 682, 693 (Neb. 2021); *People v. Marin*, 163 N.Y.S.3d 774, 780 (N.Y. Crim. Ct. 2022); *State v. Robinson*, No. 110467, 2022 WL 1180668, at *11 (Ohio Ct. App. Apr. 21, 2022). *But see State v. Labrecque*, 249 A.3d 671, 680–82 (Vt. 2020) (holding that pandemic delay weighed against the State on a Fifth Amendment pretrial detention claim).

15. We note, again, that Kristy's trial was the first jury trial to take place in Utah after the COVID-19 pandemic broke out. It is not an overstatement to say that no trial judge in Utah worked harder than this one did to make jury trials a reality as soon as possible after the pandemic hold. We not only reject Stephanie's attempts to cast aspersions on this judge's actions with regard to jury trials during the pandemic, but we commend this judge for his efforts.

C

¶65　"The third *Barker* factor requires examination of the defendant's assertion of his right to a speedy trial." *Hintze*, 2022 UT App 117, ¶ 34. It is, of course, ultimately "the responsibility of the courts and the prosecutors to assure that cases are brought to trial, but defendants bear some responsibility to demonstrably assert their right to a speedy trial." *Id.* (quotation simplified). This third factor, at root, is about whether the defendant's "behavior during the course of the litigation evinces a desire to go to trial with dispatch." *United States v. Batie*, 433 F.3d 1287, 1291 (10th Cir. 2006). "Defendants who drag their feet and only half-heartedly express an interest in a speedy trial will have this factor weighed against them. On the other hand, defendants who do everything they could possibly do to evince a desire to go to trial will have this factor weighed in their favor." *Hintze*, 2022 UT App 117, ¶ 41 (quotation simplified).

¶66　In this case, Stephanie first invoked her right to a speedy trial in August 2018, when Trial Counsel orally "invoke[d] the right to a speedy trial for the record." But this invocation of the right is precisely the sort of "half-hearted" expression of interest in a speedy trial that we were referring to in *Hintze*. After making this invocation, "for the record," Stephanie spent the next couple of years litigating various motions—including her motion to sever and motion to change venue—that she knew would cause "a big delay." Indeed, we have already noted that Stephanie was responsible for 641 days of delay in this case, and most of that time occurred *after* her initial invocation of the right to a speedy trial.[16]

---

16. We do not intend to call into question Trial Counsel's choice to file motions, including the motion to sever, that would result in delay; after all, the motion was ultimately successful. But time spent attending to even well-intentioned strategic defense

(continued…)

¶67    In July 2020, some two years after Stephanie's initial invocation of her right to a speedy trial, Trial Counsel filed a document captioned "Speedy Trial Invocation," in which Stephanie "invoke[d] her right to a speedy trial" and registered her opposition to "any further delays in proceeding to trial." At this point, the pandemic was in full swing and the chief justice's orders restricting jury trials were in effect. And Stephanie even offered to waive her right to a jury trial and have her case tried to the bench. This July 2020 invocation of the right to a speedy trial was in no sense half-hearted, and in our view represents the point in time at which Stephanie truly invoked her right to a speedy trial. Stephanie then followed up her July 2020 invocation of the right with a September 2020 motion to dismiss her case for a speedy trial violation.

¶68    But Stephanie's problem, after that point, is that both the trial court and the State did everything they could to schedule the trial as speedily as possible. The court stood willing to cancel or postpone all civil matters, and even some of its criminal law-and-motion calendars, to get Stephanie's trial scheduled in a timely fashion. It set a trial date for September, but that date was canceled due to the pandemic. It attempted to schedule a new date for November, but that didn't work with Trial Counsel's schedule. It then set a new date for December, but that too fell to pandemic-related concerns. As noted, the case finally proceeded to trial in March 2021.

¶69    In sum, Stephanie only half-heartedly invoked her right to a speedy trial prior to July 2020. Viewed only up to that point, this

---

motions still counts against the movant, and not against the State, in a speedy trial analysis. *See, e.g., Newell v. State*, 175 So. 3d 1260, 1269–70 (Miss. 2015) (stating that "well-taken motions" by a defendant "may justify a delay in criminal cases" but such a delay "caused by the actions of the defendant . . . tolls the running of the time period for that length of time" (quotation simplified)).

third factor should be weighed against Stephanie. But she did quite vigorously assert her right after that, and so in the end we view this factor as an ultimately neutral factor that weighs neither strongly in favor of Stephanie nor strongly against her.

D

¶70   The final *Barker* factor "requires an examination of the extent to which [Stephanie] was prejudiced" by the delay in having a jury trial, and is—much like the second factor— considered a "crucial factor." *See Hintze*, 2022 UT App 117, ¶ 43. "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. Specifically, those interests are (1) "prevent[ing] oppressive pretrial incarceration;" (2) "minimiz[ing] anxiety and concern of the accused;" and (3) "limit[ing] the possibility that the defense will be impaired." *Id.* "Of these, the most serious is the last, because the inability of a defendant adequately to prepare [her] case skews the fairness of the entire system." *Id.*

¶71   Stephanie did not assert at the trial court level, and does not assert here on appeal, that she suffered any specific impairment to her defense as a result of the three-year delay in getting this case to trial. That is, she cannot identify any evidence that was lost or witness that was rendered unavailable by the passage of time. Thus, Stephanie has not demonstrated any prejudice of the sort that is considered "the most serious": impairment to her defense. *See id.*

¶72   But Stephanie did sustain, at least at some level, the other two types of prejudice. She was subject to a longer period of *pretrial* incarceration due to the length of time it took to get her case to trial, and she undoubtedly experienced additional anxiety and concern about the pending proceedings. These elements of prejudice are far from trivial, and even the State acknowledges

that Stephanie did experience at least *some* additional prejudice as a result of the delays in getting to trial.

¶73 We agree, however, with the State's assessment of the way this factor should be evaluated. Where Stephanie cannot demonstrate any specific impairment to her defense, but can demonstrate some additional anxiety and pretrial incarceration, this factor weighs in Stephanie's favor, but not heavily.

E

¶74 The last step of a *Barker* analysis is "to balance the four factors." *Hintze*, 2022 UT App 117, ¶ 68. Although two of the factors—the length of delay and prejudice—weigh in favor of Stephanie, those do not weigh heavily in her favor. In this case, where the important reason-for-delay factor does not weigh in her favor and where she can demonstrate only slight prejudice, we do not view the overall balancing test coming out in Stephanie's favor. Certainly, three years is a long time to get a case to trial. But here, all parties—Stephanie, the State, and especially the trial court—worked very hard to get these complicated cases tried as soon as possible in a small county in the middle of a once-in-a-century public health crisis. And under these circumstances, where the State did not even negligently— let alone deliberately—contribute to any of the delay, we cannot say that Stephanie's right to a speedy trial was violated. We therefore discern no error in the trial court's decision to deny Stephanie's motion to dismiss.

## II. Alibi Witness

¶75 Next, Stephanie challenges the trial court's decision to forbid Mother from offering alibi testimony at trial. Under Utah law, a defendant "who intends to offer evidence of an alibi" must provide written notice, at least ten days prior to trial, "of [her] intention to claim alibi." *See* Utah Code § 77-14-2(1). In particular,

and among other information, this notice must contain "the names and addresses of the witnesses by whom [the defendant] proposes to establish alibi." *Id.* If a defendant "fails to comply with" the statute's requirements, "the court may exclude evidence offered to establish or rebut alibi." *Id.* § 77-14-2(3). But the trial court may, in its discretion and "for good cause shown, waive the requirements" of the alibi notice statute. *Id.* § 77-14-2(4).

¶76    More than ten days prior to trial, Stephanie gave notice that she intended to claim alibi. In that notice, she stated that she "was not present at the scene of the alleged offense," and that she would present evidence that she "was at [M]other's home when the other alleged offenders left to go to the scene and that during the commission of the alleged offense she had returned to her own residence to handle a medical issue." She indicated that a "lay witness will be called by the defense and an expert witness will be called to lay foundation for the alibi." She then identified the single lay witness as Amy. In the notice, Stephanie did not list Mother as a potential alibi witness.

¶77    At trial, Stephanie presented Amy as an alibi witness, as she had indicated in the notice. But then she asked the court for permission to present Mother as an additional alibi witness. The court ruled that Mother could take the stand, but that she could not offer alibi evidence because she was not included in Stephanie's notice of alibi. In particular, the court ruled that Mother could not testify about (1) a phone call Stephanie claimed to have made on her way to Mother's house or (2) the timing of when Stephanie came back to Mother's house. Stephanie challenges this ruling on several grounds, first asserting that the proffered evidence was not alibi evidence at all and therefore not subject to the statutory notice requirement; next claiming that the trial court should have allowed the testimony anyway; and finally contending that the court's ruling violated her constitutional rights. We discern no infirmity in the court's ruling.

¶78    We first reject Stephanie's assertion that Mother's proposed testimony about the phone call and the timing of Stephanie's return was not alibi evidence. It quite clearly was. The purpose of offering Mother's testimony about these things was to demonstrate that Stephanie was not at the scene of the attack but was, instead, either at Mother's house or at her own residence attending to her medical issues. We quite comfortably conclude that Mother's proposed testimony qualified as alibi evidence within the ambit of the alibi notice statute.

¶79    And we likewise reject Stephanie's assertion that the court abused its discretion by enforcing the alibi notice statute according to its terms in this situation. A court's decision regarding whether to waive the requirements of the alibi notice statute is reviewed deferentially. *See State v. Perea*, 2013 UT 68, ¶¶ 87–88, 322 P.3d 624. Thus, it may well have been within the court's discretion to have allowed Mother's testimony in this instance. But we will reverse a court's decision in this regard only where we perceive an abuse of that discretion, something that is reserved for clear cases. *See, e.g.*, *State v. Ortiz*, 712 P.2d 218, 220 (Utah 1985) (concluding that a court abused its discretion when it refused to allow a defendant to substitute a new alibi witness for a disclosed one who had become unavailable immediately prior to trial). Stephanie did not list Mother in her notice, and she offered no good reason for the omission. Moreover, Stephanie was able to call Amy, her listed alibi witness, who was available and testified as anticipated. We cannot say that it was an abuse of discretion for the court to have refused to allow Stephanie to call a second alibi witness who had not been listed.

¶80    Finally, Stephanie raises constitutional concerns with the alibi notice statute, claiming that she had a due process right to present a defense to the criminal charges, and that the court's ruling pursuant to the statute impaired that right. Even assuming

that this argument was preserved,[17] it fails on its merits. To be sure, criminal defendants have a constitutional "right to present a defense." *See State v. Thornton*, 2017 UT 9, ¶ 74, 391 P.3d 1016 (quotation simplified). But this right is "far from absolute," *id.* ¶ 7, and it does, "in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *see Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quotation simplified). State procedural rules, including alibi notice statutes, represent the sort of legitimate interests that can permissibly impact a defendant's right to present a defense. *See Taylor v. Illinois*, 484 U.S. 400, 411–12 & n.16 (1988) (stating that "[t]he State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always flexible, rules relating to the identification and presentation of evidence," and listing alibi notice statutes as an example of the sort of discovery-based rule that, if not followed, could result in a defendant not being allowed to present desired evidence); *Williams v. Florida*, 399 U.S. 78, 84–86 (1970) (stating that "[n]othing in the Fifth Amendment privilege entitles a defendant . . . to await the end of the State's case before announcing the nature of [the defendant's] defense," and upholding alibi notice statutes as consistent with due process and the right against self-incrimination); *see also* Ferdinand S. Tinio, Annotation, *Validity and Construction of Statute Requiring Defendant in Criminal Case to Disclose Matter as to Alibi Defense*, 45 A.L.R.3d 958, §§ 2, 4–9 (2022) (citing additional cases). Indeed, our supreme court has stated that a defendant who failed to comply with the alibi notice statute had not been deprived of the opportunity to

---

17. This argument does not appear to have been preserved for appellate review. But where "the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (quotation simplified), *cert. denied*, 496 P.3d 718 (Utah 2021). We opt to do so here.

present alibi evidence, because "[a]ll he needed to do was comply with the [statutory] timing requirements." *See State v. Maestas*, 815 P.2d 1319, 1325 (Utah 1991).

¶81 Stephanie had every opportunity to call Mother as an alibi witness. She simply needed to list Mother, along with Amy, in her notice of alibi. She did not do so, and failed to articulate to the trial court any good reason why she hadn't.[18] And she was able to call her listed alibi fact witness. Under these circumstances, we see no infirmity in the trial court's decision to limit Mother's testimony and refuse to allow her to provide undisclosed alibi evidence.

### III. Opening the Door

¶82 Next, Stephanie takes issue with the trial court's ruling that Trial Counsel, during cross-examination of Detective, opened the door to admission of previously excluded statements, and her challenge takes two forms. First, she appeals the court's ruling directly, and contends that Trial Counsel actually didn't open the door. Second, and in the alternative, she asserts that, *if* Trial Counsel opened the door, he rendered ineffective assistance in so doing. We analyze each claim in turn.

### A

¶83 Stephanie asserts that the trial court abused its discretion in ruling that Trial Counsel had opened the door to the previously excluded statements of Sandra and Byron. We disagree.

¶84 The statements at issue here are the statements Sandra and Byron made to officers immediately after the attack: Sandra indicated that one of her attackers was the Tuinman sister who

---

18. On appeal, Stephanie makes no assertion that Trial Counsel rendered ineffective assistance by failing to list Mother in the notice of alibi.

was dating Byron, and Byron stated that he and Stephanie had indeed been present at the attack. Officers were aware of these two statements by the time they interviewed Stephanie at the police station at 4:00 a.m. on the morning after the attack. And these two statements gave officers reason to believe that Stephanie had participated in the attack along with others, and apparently gave Detective reason to believe that Stephanie was lying when she denied any involvement in the evening's events.

¶85 The trial court made a pretrial ruling excluding the substance of these statements from being admitted at trial (although, as discussed below, subsequent events changed matters concerning Byron's statement). In light of this ruling, the State's questioning of Detective on this particular point during direct examination was cursory: the prosecutor merely elicited the fact that Detective thought Stephanie was being less than fully truthful when she denied any involvement, and that his basis for that belief was that officers were in possession of certain "statements." But in keeping with the court's ruling excluding from evidence the content of those statements, the State did not ask Detective any questions about what those "statements" were, who made them, or what they might contain; as the court later noted, the State "steered clear" of delving into the details of the basis for Detective's belief. And Trial Counsel lodged no objection to the State's direct examination in this regard.

¶86 On cross-examination, however, Trial Counsel made a strategic decision to delve deeper into the reasons why Detective accused Stephanie of not telling him the whole truth. He asked Detective whether calling suspects "a liar" was "an interview technique" designed to elicit more favorable answers. Detective acknowledged that "[i]t could be" part of an interview technique, but he maintained that his "main goal is to try to get to the truth." Trial Counsel established that Detective had called Stephanie a liar quite early in the interview, and then asked him this open-ended question: "Then why would you call somebody a liar right

out of the gate?" Detective replied, "Because I didn't think I was getting the truth."

¶87    After this exchange, the court ruled that Trial Counsel, by asking Detective specific questions about his reasons for calling Stephanie a liar, had "opened the door" for the previously excluded statements to come in for their "effect on the hearer." The court noted that, in its view, Trial Counsel "extensively question[ed]" Detective about "why he would call [Stephanie] a liar and made a lot of hay out of him calling her a liar and investigating her with no evidence or no reason to even question her," and thereby "paint[ed] the picture that [Detective] was doing something improper." Thus, the court ruled that the statements from Sandra and Byron could come in to more specifically explain Detective's skepticism of Stephanie's account.

¶88    "Once the defendant offers evidence or makes an assertion as to any fact, the State may cross-examine or introduce on rebuttal any testimony or evidence which would tend to contradict, explain or cast doubt upon the credibility of [the defendant's] testimony." *State v. Thompson*, 2014 UT App 14, ¶ 30, 318 P.3d 1221 (quotation simplified); *see also State v. Guerro*, 2021 UT App 136, ¶¶ 28–32, 502 P.3d 338 (holding that a district court "did not abuse its discretion in admitting" previously excluded evidence after opposing counsel "open[ed] the door to" admission of that evidence by "elicit[ing] a misleading—if not outright false—testimonial statement regarding the content" of the evidence), *cert. denied*, 525 P.3d 1254 (Utah 2022); *State v. Eddington*, 2023 UT App 19, ¶ 39, 525 P.3d 920 (holding that a district court "exceeded its discretion" by refusing to allow a defendant to introduce previously excluded evidence after the State, through certain arguments and questions, opened the door to its admission).

¶89    In this case, by engaging in detailed questioning about the basis for Detective's expressed skepticism of Stephanie's account,

and by suggesting that Detective had been employing aggressive interview techniques, Trial Counsel placed directly at issue Detective's reasons for stating that Stephanie was lying. It was not outside the bounds of the trial court's discretion for it to conclude that the State was entitled to rebut Trial Counsel's suggestions with the previously excluded details of Sandra's and Byron's statements. We therefore discern no abuse of discretion in the court's ruling that Trial Counsel opened the door to admission of those statements.

B

¶90    Alternatively, Stephanie asserts that Trial Counsel rendered ineffective assistance by opening the door to the admission of the previously excluded statements. To establish that Trial Counsel was ineffective, Stephanie must show both (1) that Trial Counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Because "failure to satisfy either part of the ineffective assistance test is fatal to a defendant's claim," *State v. Popp*, 2019 UT App 173, ¶ 48, 453 P.3d 657 (quotation simplified), *cert. denied*, 485 P.3d 943 (Utah 2021), we need not "address both components of the inquiry if we determine that [Stephanie] has made an insufficient showing on one," *see Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (quotation simplified).

¶91    The first part of the test requires Stephanie to show that Trial Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by

trial strategy. *See id.* ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶92   If Stephanie establishes that Trial Counsel rendered deficient performance, she must next show that she was prejudiced by that performance. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified).

¶93   Even assuming, for purposes of our discussion, that Trial Counsel performed deficiently by opening the door to admission of the previously excluded statements, on this record Stephanie has not demonstrated a reasonable likelihood that the outcome of the trial would have been different if the door had not been opened. The only two statements that came in through the opened door were (1) Sandra's statement that the Tuinman sister who was dating Byron had been among her attackers, and (2) Byron's statement that Stephanie rode with him, Thomas, and Samantha to Roy's house. And we can necessarily eliminate the second of these statements from our prejudice calculation, because Byron's

statement came into evidence anyway, through Byron's own testimony after the State called him as a witness.

¶94 The court had originally excluded Byron's statements, along with all of the other co-defendants' statements, apparently on Confrontation Clause grounds. But that issue was resolved once Byron pled "guilty but mentally ill" to certain counts, so the State called Byron as its own witness. When the time came for Byron to take the stand, Trial Counsel did not lodge any objections to his testimony, and Stephanie does not now allege, on appeal, that Byron should not have been allowed to testify at trial or that there were any evidentiary problems with his testimony. And during that testimony, after Byron initially denied that Stephanie went to Roy's house the night of the attack, the State introduced into evidence, by way of impeachment, Byron's statement to police in which he said that "[m]e, Samantha, and Stephanie" were in the minivan with Thomas that night. After listening to his interview statement, Byron then testified that he had in fact told police that Stephanie was also in the minivan with them and that "she brought the bat" with her, but he maintained that he had been "intimidated" into saying that. Accordingly, because the jury heard Byron's statement through another means, the fact that this statement also came in through the door Trial Counsel opened cannot have caused Stephanie any prejudice.

¶95 Thus, the prejudice inquiry here revolves entirely around Sandra's statement. And we are simply not persuaded that there is a reasonable likelihood of a different result in this case if the jury had not heard Detective testify that, prior to interviewing Stephanie, he had been made aware of Sandra's statement that one of her attackers was the Tuinman sister who was dating Byron. Even without Sandra's statement, the State still had strong evidence supporting its case, most notably Samantha's testimony regarding Stephanie's involvement in the attack and Byron's statement to police that Stephanie had been present at the scene.

In our view, Stephanie has not carried her burden of demonstrating *Strickland* prejudice here.

¶96    In sum, then, the trial court did not abuse its discretion by determining that Trial Counsel had opened the door to admission of the two previously excluded statements. And Stephanie has not demonstrated that Trial Counsel rendered constitutionally ineffective assistance in opening that door.

## IV. Timing of Sentencing

¶97    Next, Stephanie contends that the trial court erred in sentencing Stephanie in April 2021, before a May change in the sentencing statutes took effect. A criminal defendant has the right to be sentenced "not less than two nor more than 45 days after the verdict or plea, unless the court, with the concurrence of the defendant, otherwise orders." Utah R. Crim. P. 22(a). Stephanie's sentence occurred thirteen days after the verdict, and therefore fell comfortably within the prescribed window.

¶98    But in many cases, especially cases in which sentencing may end up being severe or complicated, trial courts wait until the end of the prescribed window—or, with the consent of the defendant, a week or two beyond it—so that they may have the benefit of a presentence investigation report prepared by Adult Probation and Parole. In this case, the court ordered a presentence report, but at the State's request did not postpone sentencing until after that report was received; instead, the court held a sentencing hearing on April 12, 2021, before the report was completed.

¶99    The State was quite transparent about its reason for requesting a speedy sentencing: in the legislative session that had just ended, our legislature enacted a statutory change, set to take effect in May, that would, among other things, shorten by five years the mandatory minimum sentence Stephanie would need to

serve on the murder and aggravated burglary charges.[19] At the time the State made its request for a speedy sentencing—right after the verdict—Trial Counsel stated simply that he was "not aware of the change in the law" and was therefore "not prepared" to address it. He did not lodge any objection to the State's request that Stephanie be sentenced prior to the new law going into effect, and the court granted the State's request for an unusually quick sentencing process. On April 12, the court sentenced Stephanie, imposing the higher twenty-years-to-life sentence (as opposed to fifteen years to life under the new statute) on the murder count and the higher ten-years-to-life sentence (as opposed to five years to life under the new statute) on the aggravated burglary count.

¶100   On appeal, Stephanie acknowledges that her challenge to the trial court's expedited sentencing process is unpreserved. And the only one of the three exceptions to our preservation doctrines that Stephanie here invokes is the extraordinary circumstances exception. *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 (explaining that under Utah law, there are "three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances").[20] This exception is

---

19. Under Utah law, criminal sentences are steeper for crimes committed "in concert with" multiple other people or otherwise for the benefit of a "street gang." *See* Utah Code § 76-3-203.1(2). Prior to May 2021, any first-degree felony committed "in concert" was subject to a five-year increase in the mandatory minimum sentence. *See id.* § 76-3-203.1(4) (2020). But in the 2021 legislative session, our legislature removed the minimum-mandatory enhancement for first-degree felonies. *See* Act of Mar. 16, 2021, ch. 207, § 1, 2021 Utah Laws 1356, 1356–58.

20. To be clear, Stephanie does not claim that the trial court plainly erred by expediting the sentencing process, nor does she assert

(continued…)

intended to cover situations in which "a rare procedural anomaly has either prevented an appellant from preserving an issue or excuses a failure to do so." *Id.* ¶ 29 (quotation simplified). Stephanie asserts that the change in the law that took effect in May is the sort of "rare procedural anomaly" that justifies application of the extraordinary circumstances exception. We disagree.

¶101 For the extraordinary circumstances exception to apply, some "anomaly" must be present that either (a) prevented Stephanie from objecting to the State's request for a speedy sentencing, or (b) excuses her failure to object. *See id.* No such anomaly is present here. Certainly, there was nothing that prevented Trial Counsel from objecting to the State's request; after all, the State put its cards squarely on the table when it asked for the speedy sentencing, explaining that the law had been changed to Stephanie's benefit effective May 2021 and asking for sentencing to occur before then. Trial Counsel could have objected right then, even if he was not yet familiar with the precise contours of the statutory amendment, or he could have objected a few days later, after researching the issue. At a minimum, Trial Counsel could have objected at the actual sentencing hearing itself, and asked for a continuance. There was nothing here—anomalous or otherwise—that prevented Stephanie or Trial Counsel from objecting to the State's request for an expedited sentencing. And Stephanie does not even attempt to argue that this change in the law somehow operated to excuse her failure to preserve the issue for our review.

¶102 This situation is therefore a poor fit for application of the extraordinary circumstances exception, and we decline the invitation to apply it here. Because the only preservation exception Stephanie invokes does not apply, we conclude that

---

that Trial Counsel rendered ineffective assistance by not objecting to the expedited sentencing process. We therefore address neither of these exceptions.

Stephanie's objection to the court's sentencing process is unpreserved, and we therefore decline to discuss it further.

## V. Rule 23B Motion

¶103   Finally, we address Stephanie's motion, filed pursuant to rule 23B of the Utah Rules of Appellate Procedure, seeking an order remanding the case to the trial court for further factfinding relating to additional potential ineffective assistance of counsel claims. Under rule 23B, a defendant "may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). "We apply a four-part test to evaluate rule 23B motions." *State v. Samora*, 2021 UT App 29, ¶ 50, 484 P.3d 1206 (quotation simplified), *aff'd*, 529 P.3d 330 (Utah 2023). First, the motion must allege facts not already in the record. *See State v. Griffin*, 2015 UT 18, ¶ 18, 441 P.3d 1166. Second, those factual allegations must not be speculative. *Id.* ¶ 19. Third, the allegations must demonstrate that counsel performed deficiently, and fourth, the allegations must show that counsel's deficient performance prejudiced the defendant. *See Samora*, 2021 UT App 29, ¶ 50.

¶104   In her rule 23B motion, Stephanie asserts that Trial Counsel performed deficiently by failing to call three witnesses: Attorney, Neighbor, and a private investigator (Investigator) who compiled a report for the defense. Stephanie contends that had these witnesses been called to testify, there "is a substantial possibility that the outcome of Stephanie's trial could have been acquittal."

¶105   But Trial Counsel did not perform deficiently by deciding not to call Attorney to testify. He was fully aware of what Attorney had to say; after all, Attorney had testified at Kristy's trial, and Trial Counsel and Attorney had spoken several times prior to Stephanie's trial. During the opening days of Stephanie's trial, even the State appeared resigned to the fact that Stephanie

would likely call Attorney to testify and rebut Samantha's trial-testimony version of events; during its direct examination of its key witness, Samantha, the State preemptively introduced evidence of Samantha's conversation with Attorney. In the course of this direct examination, Samantha acknowledged that she had had a conversation with Attorney at the jail and that she had told him the same story that she had initially told law enforcement: that nobody else was involved in the attack aside from her and Thomas. Trial Counsel, on cross-examination, followed up with Samantha about this conversation, and she did not deny that the conversation took place and again confirmed that she told Attorney "the same thing that [she] had told the officers."

¶106 There were only two participants in the conversation between Samantha and Attorney. One of them—Samantha—testified early in the trial about the conversation, and confirmed that it had taken place largely as Attorney describes. Thus, the evidence Trial Counsel would have wanted Attorney to introduce was already in the trial record, without Attorney needing to testify, and it had come in, without dispute, through Samantha's own testimony. In our view, a reasonable attorney could very well have decided not to call Attorney under these circumstances. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 (stating that "the ultimate question" in assessing counsel's performance is "whether [counsel's] conduct was objectively reasonable"); *see also supra* ¶ 91.[21]

---

21. Thus, most of Attorney's proffered testimony ended up being cumulative of and consistent with Samantha's account of their conversation. And the parts that weren't cumulative—Attorney's proffered testimony that he could tell that Samantha was telling the truth during their conversation—would have been inadmissible in any event. *See State v. Valdez*, 2021 UT App 13, ¶ 55, 482 P.3d 861 (stating that "human lie detector" testimony is inadmissible), *cert. granted*, 496 P.3d 715 (Utah 2021).

¶107 The other part of Stephanie's rule 23B motion—her claim that Trial Counsel performed deficiently by not calling Neighbor and Investigator as witnesses—we resolve on prejudice grounds, because in our view Stephanie cannot demonstrate a reasonable likelihood of a different result at a trial in which those two witnesses took the stand. *See Scott*, 2020 UT 13, ¶ 43 ("The burden is on the defendant to demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error."); *see also supra* ¶ 92. Stephanie claims that Neighbor and Investigator should have been allowed to introduce evidence that Neighbor heard only a "single vehicle" leave the scene of the attack at around midnight. This testimony would have been unhelpful for two reasons. First, Neighbor's timing is off by almost three hours because it was undisputed at trial—by video surveillance of Samantha's minivan around 9:00 p.m. and by the 911 call made around 9:20 p.m.—that the attack occurred shortly after 9:00 p.m. A discrepancy of almost three hours seriously undermines the value of Neighbor's testimony. Second, testimony about there being only one vehicle would not have changed the landscape for Stephanie—as opposed to, potentially, Kristy or Michael—when testimony from Byron and Samantha already established that Stephanie had arrived in the minivan, not in another vehicle. Only Kristy and Michael were said to have arrived in separate vehicles; thus, even if there had been testimony that only one vehicle had driven to the scene that night, such testimony would not have been much use to Stephanie. We simply do not perceive a reasonable probability of a different outcome if Stephanie's trial had included testimony from Neighbor and Investigator.

¶108 Under these circumstances, Stephanie has not met the prerequisites for the granting of a rule 23B motion. Accordingly, we deny Stephanie's motion.

CONCLUSION

¶109   Stephanie has not demonstrated that her constitutional right to a speedy trial was violated here. The trial court did not abuse its discretion by limiting Mother's testimony to exclude alibi evidence. The trial court also did not abuse its discretion by determining that Trial Counsel had opened the door to admission of the two previously excluded statements, and Stephanie has not borne her burden of showing that Trial Counsel rendered ineffective assistance by opening that door. Stephanie's challenge to the timing of her sentencing process is unpreserved for appellate review. And we deny her rule 23B motion.

¶110   Accordingly, we reject all of Stephanie's claims on appeal and affirm her convictions.

—————